whenever council are ready. Good morning, your honors, and may it please the court, my name is John Hacker, counsel for Ford. Your honors, this case illustrates the wisdom of this court's holding in the Oglesby case, applying now familiar Daubert gatekeeping standards to expert evidence that, quote, a plaintiff may not prevail in a product's liability case by relying on the opinion of an expert unsupported by any evidence such as test data or relevant literature in the field. In this case, to find the 2001 Ford Rangers speed control assembly, quote, defective under the Virginia Supreme Court's Morningstar standard, excuse me, what's Virginia Supreme Court's Morningstar standard? Plaintiffs had to prove that the assembly was not reasonably safe based on, quote, reasonably prudent manufacturer standards at the time. And as Morningstar recognizes, to make that proof, quote, the expert witness is ordinarily the critical witness. So it was here. Sam Serra was the only witness plaintiffs proffered to establish a defect in the design of the 2001 Ranger speed control assembly. The problem is that Serra's opinion is completely unsupported by any scientific methodology in any material respect. And they say, but they don't need to be because Daubert's not even applicable. Right. And both the Supreme Court and this court have disagreed with that. Kumho Tyer addressed that square question and held that in a case that Daubert applied to engineering testimony, in fact, in a case involving auto engineering, and Oglesby did the same thing. So that threshold proposition is incorrect. Although I think it's telling that that's the first in principle argument that we don't need to talk about Daubert because I think it's a tacit admission. And I won't overstate that. But I think a tacit admission that they've got a serious problem when you apply Daubert because Serra's opinions as to both defect and causation were not supported by the kind of scientific methodology that Daubert requires. As to the defect question, the threshold question under the Morningstar standard. First, he did not test the Ranger assembly in any way to determine whether or if so how often it can accumulate sufficient fine near microscopic particulate to bind the cable against 7.2 pounds of force applied by the countersprings. Second, he did not test any of the other designs he said were safer to determine whether or not they would actually bind a cable less often than the 2001 Ranger assembly. Then as to causation, he also failed to test the type and amount of particulate he identified in Mr. Neese's assembly to determine whether or not that amount and that type of particulate actually could cause or did cause the binding in this case. He just saw it. Yeah, I take your point. And I read all of his testimony. And you did a great, did you do the cross-examination? I did not. Whoever did the cross-examination did, I thought, a great job and raised all those points. And apparently the jury was not persuaded. He's a very good witness. I mean, he seems, you know, you can't really tell from the written word, but he seems very likable, very genuine. And he'd been an expert in a whole bunch of other cases, apparently. So does that affect whether we think he meets the standard at all? Absolutely not, Your Honor. Because that presents the problem. It doesn't answer the problem. That's what Daubert was getting at. Precisely because somebody can be impressive and seem scientific. That was prelude to he's been accepted as an expert in a lot of other cases, apparently. At least that's what the record looks like. Right. That doesn't tell you whether he's an expert. This goes to qualifications, not his methodology. And that's like our third of a number of arguments against the admission of his testimony. But as to his qualification, as this Court said in the Thomas Klein case, it would be, quote, absurd to say that the fact that you've built up expertise just by testifying makes you qualified to testify on a particular topic. He is only an electrical engineer, Your Honor. He's not a mechanical engineer. He's not an automotive engineer. He's an electrical engineer who testifies. But not about electronic. Right. I mean, I would think you would be heralding that, too. He never even practices electrical engineering. Oh, yes. Fair enough. Yes. Yes. No, that's a true point, too. Now, this Court also said in Thomas Klein, the fact that you've testified a lot doesn't mean you're not qualified. But you have to be qualified. It's not itself sufficient to establish that. And he doesn't have any professional background, particularly with automotive engineering, not even mechanical engineering. He's an electronic engineer. In some other cases, he may be adequately qualified to testify. But not in this case. But he's testified in cases similar to this one. Isn't that right? And he's also been stricken in cases similar to this one. In Donnelly and Buck. I think the Buck case is the best example. And I don't want to say that he should be stricken here just because he was stricken in another case. We need to look at— That would be counterintuitive to your— That would be contrary to your— Right. I mean, the question— This case stands on its own. And actually, more precisely, I think it falls on its own. But I think one reason, an exemplar precedent, is the Buck case where the court said in a different context, but rejected his testimony because of the same problem that exists here, which is all he did was state a hypothesis. He said, I see a problem. This could be a problem. Therefore, I think it was the problem. And the court said, that's like the antithesis of the scientific method. It's the beginning of the scientific method. State a hypothesis. But then what do you do? You test it. Is there some document from Ford where they had said this was a problem earlier in another model, to be sure? Not quite. What that document was before— It was at the earliest design stage. It's a brainstorming document. To do it in scientific terms, it's to state a hypothesis. It's to say, this is the kind of problem that can arise with any kind of cable assembly. I mean, anybody who's tried to start a lawnmower will recognize that cables can sometimes bind. That's a thing that can happen. The FMEA document goes through a litany of things that can happen in the design of an automobile and says, these are all potential failure modes. Problems that can arise. Not about this automobile or even this assembly. Just any speed control assembly that works with a cable can have the following sets of problems. The next column over says, what have we done so far to identify, to solve those problems? And then there's another column that's left on that particular document to provide for measures. All it does is identify a potential problem so that the engineers know and can think about ways to solve the problem. The question in this case is, with respect to this design, instituted later and installed in the vehicle later, what was defective about it? Was it the design a reasonably prudent manufacturer would adopt at the time? And Ciro, in answering that question, no, first opined that the casing, as it was designed, allowed a sufficient amount of material of contaminants into the casing to bind a cable against a 7.2 pounds of force. The problem was, that was a hypothesis. It could, maybe that might happen, but he never tested whether or not this particular design, the way it was set up and the spacing between the casing and the guide tube and the lubricious materials it was made of, were sufficient to actually create this particular problem. Nor did he figure out, by conducting the kind of tests that Ford conducted, how often this kind of problem would arise. He has no idea what the answers to those questions are. So what would he have had to, how would you have had him test it? I would have him do exactly what the record shows that Ford did, and that you can find this at JA 2471-73, an explication of the kinds of tests Ford ran, which was, to summarize it briefly, and the details are in the testimony, but they basically set up a machine that ran the speed control assembly through life cycles like 500,000 times and put dust into it, put it in a humid room so the dust could coagulate and get clumpy, put other, sprayed it with other materials, literally hundreds of thousands of times in different cycles to test whether or not it would bind, how often it would bind, and then determine that it was reasonably safe, and use that in its... Infrequently. Never. Zero times. Okay. So, sorry, no, go ahead. If he's the expert, isn't it his obligation to come up with a test or explain why a test would not be appropriate in that circumstance? A hundred percent. I was only asking the question, what would you do, hypothetically, Ford actually did it, but of course, and I'm loathe to say the word burden of proof, we've heard a lot about that this morning already, but it was their burden to establish that it was defective to show through adequate and appropriate tests that it would bind ever, they didn't prove that, or that it would bind too often. And that's a critical point because of the other element of a defect showing under the Morningstar test and under Cero's own testimony, which is not only what it is about this design in itself that is unreasonably safe, but compared to what? Cero's testimony, there may be a dispute under West Virginia laws whether or not you have an obligation to identify an alternative design. We think the restatement answers that question. But leaving that to one side for a moment, it was Cero's own way of showing defect. He didn't know anything about this particular design, what actually happened, because he never tested it. So all he said is, I know it's defective because there are other available designs Ford itself had used three other designs. Okay, what does the scientist think of that proposition? That's a hypothesis. Hypothesis would be that those other designs are actually safer. In order to testify and opine that they are safer, we have to know, the jury has to know, the judge has to see in advance what his methodology is for understanding and knowing that those are actually safer. So you'd have to compare the results of your test, which you didn't do of the item in question, to the other items that he's proposing as safer. And he has no idea whether or not those designs result in binding more often or less often, as he would have to show, less often than the design used in the 2001 Ranger Assembly. He just conducted no tests of it. So we don't know whether or not this was actually less safe than the alternatives he was proposing. And in fact, to emphasize, he admitted on the record that he didn't conduct any tests. All he said was, well, Ford used them, so they've been tested. That kind of goes back to my original question. When I read his brief, I don't see him, he doesn't seem to be challenging that he didn't do any tests, that he didn't have any comparators to talk about. His position on his brief is, I don't have to do all that because Daubert doesn't apply. Right. So it seemed to me that the focus of your argument, I understand your argument that you've made so far, but it seems to me the focus to meet his brief is that Daubert applies and you've got to do these things. The focus of my argument? Yes. I mean, that absolutely is right. I am leaping ahead to the, if there's a contest over whether or not Daubert applies, and frankly, I don't think there really should be. I mean, Daubert clearly applies. I don't think they can get past Kumho-Tyre and this Court's decision in Oglesby. I am addressing going on. I would love to stop there because if that's their only argument, then I think it's clear that we win if one reads them as going further to address Daubert. I think that question is just as easily answered, but there may be some more controversy over that. But candidly, there shouldn't be because he doesn't even purport. In fact, when they get to the point about the safer alternatives, he's sort of proudly confident about the fact that he never did tests. Tests? Why would I do tests? He says with professed outrage. Ford used them. They must be safer. I understand his argument. He believes Daubert only applies to new or novel theories or technologies. Right. Would not apply to something or he does not categorize the problem in this case as falling in that category. Right. And that's not correct because it applies to any scientific theory. Now, some scientific theories don't need to be subjected to new tests because they've already been assessed in the literature and by other scientists actually applying scientific method. And that's what the Court is getting at in Oglesby when it says you need to have an opinion of an expert supported by evidence such as test data or relevant literature in the field. So you don't always need to test everything if it's been tested. The problem here is he's got a theory. So it's novel in the sense that he's got this idea that he thinks this particular design creates this problem and creates it more often than an alternative design. That has to be tested. He can't just say, I think it's true because I think it's true. Counsel will have, he'll have the opportunity to explain why Cuomo Tire doesn't squash his argument on that particular point. But as I understand it, maybe I'm reading something to it. They'll have the opportunity to respond. They don't appear to address any of the Dauber factors, but they say, nonetheless, we have measures of reliability that still bring us within acceptance under the rule. And as I understand it, the only two items that they use for that are this FEMA theory and the Borescope examination. Those are the only measures of reliability that they can rely on, having eschewed trying to comply with Daubert otherwise. So how would you address those? Let me start with the Borescope because I think it's the easier, well, they're both easy. The Borescope is just a fancy magnifying glass. It allowed him to see something he couldn't see with his naked eye to get into the device and see what was there. The Borescope says zero. Even by his own account, it doesn't purport to establish that a reasonably prudent manufacturer would use this design as opposed to another one. So it's literally irrelevant to the threshold question of defect as to whether or not what he saw was the result of a defective design because something could have been done differently. So the Borescope gets them nowhere in terms of establishing the defect. The FMEA, we've already discussed a little bit, all that does, the undisputed record establishes, is identify a potential problem. It doesn't say anything about whether this particular design is an adequate solution to the problem. And in their brief on appeal, I think they ultimately get around to accepting that because they defend Ciro's reliance on it by saying all he's doing is using the FMEA to point to a potential problem, like among the things that could have caused the failure to decelerate and ultimately the accident, he identifies this and then he investigated it. That's what they say ultimately in the brief. The purpose of the FMEA was that it wasn't itself establishing a defect. And of course, it wasn't establishing a defect. It was only establishing on the basis of engineering brainstorming the kinds of problems that a device like this needs to address. If there are no further questions, I'll reserve the balance of my time. Thank you. May it please the court. Good morning. I'm Lee Javins. I'm here on behalf of the plaintiffs, Howard and Nancy Neese. This case, as the district court noted several times, involves the simplest of engineering principles. A mechanical cable carries dirt, grease, and grime into an enclosure and not all of it comes out. When there's a buildup of these materials, sticking can occur. So says Ford's documents. That the Daubert restrictions on expert evidence do not apply here? Your Honor, I don't think, and I'm sensitive, and actually this is a great learning process when you have to look at these cases under the magnifying glass of fourth circuit review. And so I don't know that it's appropriate to say one or a court should, that Daubert is an on-off application like a light switch. I think Daubert is to be read in conjunction with rule 702 and two of the elements of 702 are reliability. And you said in your brief that this was not a novel engineering theory and that Daubert would not apply to an engineering theory, but both Cuomo and our Oglesby case, which came after that, seem to say that that's just dead wrong. I don't think the district court here said that I'm disregarding Daubert. In fact, I think his analysis walks this court, walks all of us through a Daubert analysis because the emphasis was on reliability. Daubert is all about reliability of expert testimony. And what do you look at? You look at the methodology employed. Daubert says, Daubert says that well established propositions are less likely to be challenged than those that are novel hypotheses. The point here is that this is not... It's not just that Mr. Ciro's theory about having this cable stick has any scientific validity. Because it's a finding by Ford and a finding that's acknowledged by Ford engineers on this case, but in other cases, which is the failure modes effects analysis, which, by the way, is orthodox... It gives you a theory. Certainly, it does. The burden is on you and your expert to show how that theory has any basis in scientific facts. So you look at these Daubert factors, which are not exclusive, and as I understand your argument, you don't even make an attempt to say you fit in under any of those. You have no testing. You have no analysis as to failure rates because you didn't test. You have no scientific literature. You have nothing about acceptance in the field. All you've got is your witness. And as I read your evidence, you tell me if you've got something else. You have two items that go outside the Daubert list that you say purport to show reliability. One is this FMEA theory, and your expert applied it to the wrong model of the car, and the Borescope exam. Have you got anything else? Ford testimony, Your Honor. And more than that, but it's not clear to me when getting to the theory or getting to because Ford's first criticism in their motion was qualifications, and then as the court noted, your arguments aren't to methodology. It's that you're arguing over the results of the analysis, and that's not the purpose of Daubert because those arguments go to weight. What we have are the FMEA, the failure modes effects analysis. That is the industry standard. It's codified by the Society of Automotive Engineers. That gives you a theory. How do you get from theory to causation? We get from theory to causation based upon a couple factors. One, the testimony of four witnesses who confirmed that this event, this thing, this failure mode is a recognized failure mode within Ford, and that it has an occurrence rating, and it's changed, meaning that one out of every 100,000 vehicles, we expect that to happen here. So this is out of the idea of a novel theory. We're past novel hypothesis. How do you get to this as the one out of 100,000? What proves that point? Exactly. That's the borescope, Your Honor. Your Honor, so Mr. Ciro and the district court went to great lengths, I think, to satisfy a Daubert analysis, understanding that Daubert says itself. First of all, district courts enjoy much discretion because all these cases are factual dependent, and I might point out Ford's petition ignores the facts. We have three witnesses who have testified that we believe the throttle was stuck, and so there's a factual foundation here. But those aren't experts. Understood. Understood, Your Honor. So our expert . . . Why don't you tell us what gives the borescope exam validity? Other than Mr. Ciro saying it's a good exam, what makes this valid scientific evidence? Because that's what it's made to do. As a matter of fact, there's a case out of Florida, the Eric Caledonde case from 2004 that says borescope methodology is perfectly reliable. It's the same methodology that the reporters on ESPN, every Monday morning when a player is not going to play because they have a bad knee, it's been scoped. It's perfectly valid methodology, and what Mr. Ciro did, what Mr. Ciro was able to do in that case, unlike the hypothetical cases and novel hypothesis cases, is Mr. Ciro was able to identify witness marks, and there's a multitude of cases from this court and other courts where witness marks are what validate. That's what transforms this case from . . . Can you explain on the record what these marks were and why they made a difference? He did, Your Honor. Firstly, the borescope is also . . . it's a small camera, that is true, and it's used with a light. A tunnel should be dark, and when some light, when there was refraction back, much of that was debris, and then brighter refractions, reflections back, indicated a deep gouge. A deep gouge, the only way a gouge occurs is if some material has become stuck such that it has gouged the plastic container that the cable is contained in, and so Mr. Ciro explained that when I look at this gouge with the reflection back, that tells me this cable has stuck. There's no other explanation. That's where the engineering comes in, and the district court said that's . . . He testified that it stuck, or he testified that there was a gouge there? That the gouge was there, and that was evidence of a sticking cable, which would cause the throttle to stay stuck in the open position or not return to idle position, and so it's the forensics. It's the forensic side. It's the equivalent of a gouge mark in a highway, a witness mark on a seat belt, which this Court's well aware. It's that equivalent, Your Honor, and so respectfully, the court points out, the district court points out to Ford in their motion at pretrial, you've argued over qualifications. The court found that Mr. Ciro is qualified. He's got design experience. He's a member of the Society of Automotive Engineers. Yes, he does testify from time to time, too, but unlike the cases where this Court says qualifications alone, testifying is not enough, the court made that distinction, but he also said you made two arguments, and they both go to the weight. You're just critical of the bore scope. You don't like it. Now, had Ford said . . . because this goes to method. Ford has never challenged the method. I have one other question that I asked you before. Is there any evidence in the record that validates the bore scope examination other than Mr. Ciro's testimony? I don't believe there is, Your Honor, other than he has used it in other cases, and the court acknowledged that. Yes, I'm aware that . . . I'm not saying that's dispositive, but he testified on the record that I have used this in other cases, and . . . With respect to the markings or any potential contaminant, did he ever testify as to the value of a stick or the amount of contaminant that was required to make it stick, and why he thought that was present in this case? He would say, and he said, there wasn't enough. How do we know there was enough contaminant? Because it left a gouge mark, which is proof positive that the cable stuck within the liner. So, the judge says at pretrial, you've argued weight. You don't like it. You might mock it, and it was a great cross-examination. It was . . . it was good theater. But no one from Ford has ever challenged the methodology. They just say they don't like it. Now, if Ford were to produce a witness from the Borescope company and says, our Borescopes are great, but in this instance, that's not a reliable indication. Which was Mr. Ciro, because he was presented a Borescope examination that he identified as positive for sticking, which turned out to be a Borescope examination he had done in another case and identified it as negative. I don't think that's entirely accurate, Your Honor. There was a three-second snippet of some white matter from another case. And so, the defense lawyer, it was a great . . . it was a neat cross-examination and said, look at this, and Mr. Ciro acknowledges it. A moment later, there's an objection. We have no proof that this is our Borescope. And it was a trick, and it goes to the weight. It was a nice, great cross-examination. Very effective cross-examination. Had nothing to do with methodology. It was a trial. It was a great cross. It goes to weight. It made Mr. Ciro perhaps look less qualified, less capable. It doesn't go to the methodology. To this day, Ford has not offered any testimony, any evidence, any proof that this methodology of Borescope is somehow suspect. Well, they don't have to. Understood. But the district court, who enjoys great discretion, did find that the Borescope was reliable. He found that. And so I think it's interesting, because in the case that followed Morningstar, Church v. Wesson, there was some contention. This is a West Virginia Supreme Court case, but it's a good point, because I think courts help those who help themselves. In Church v. Wesson, a metallurgist said a rift-bolt machine wrench could have been better designed. And on pretrial, the judge says, I'm going to let you testify. And then at trial, the rift-bolt machine wrench, it should have been forged and not cast, the methodology of making. Let me, I'm sorry to interrupt you. Let me ask this. How could your expert tell that the amount of contaminant that got inside was sufficient to overcome the 7.2 pounds of force exerted by the return spring? Because it left a deep gouge mark. And the only way a deep gouge mark could be left. By leave a gouge, I mean to jam it, where it wouldn't do. Obviously, the gouge mark didn't jam it. No, the material would have caused the entire system to clog up. What is it? No, what's the evidence? What's the evidence that the amount of contaminant was sufficient to overcome the force of that spring? The gouge mark is the same as the witness mark as a pretensioner grabbing a seat belt. It's the same as a gouge mark. What test did he do to determine that? He observed it with the borescope.  No test at all? That's the test, Your Honor. In your opinion, based on looking at a gouge mark, that whatever caused the gouge mark was sufficient to overcome the force of the spring? So, there's no test, per se, like Daubert might recommend, where there is a novel hypothesis. When you say no test, you mean no test in existence or no test done? By Mr. Ciro. What's the answer to my question? I don't think I understand it. Can you please rephrase it? No test. I'm asking you, when you say no test, do you mean no test is possible to do that, or no test was done by anybody to determine that? I'm not aware of any test that Ford has ever suggested, either. Not Ford. Nope. No. Not the amount. It's not about the amount, respectfully. It's not about the amount, only that— You're not answering my question. I'm sorry. I'll try better. You start over. I'll just listen to what you've got to say. The fact that there's a gouge mark is indicative that this device stuck. And so, Ford is critical. You can't identify the amount. I don't know that anyone can. I'm quite confident Mr. Ciro would say no one can. I have observed some elements of debris, contaminants, and I've observed a gouge mark. And that is—that's a witness mark. That's a witness mark that this gouging and this sticking has taken place. And so, Ford never calls a witness to say that a borescope's not reliable. I understand that we have the— Well, when it comes to—when the court has found that the borescope is— the methodology is reliable, I think at that point, the only way to challenge methodology is to other methodology. The court found this methodology reliable because it is a witness mark, just like a seatbelt or a gouge mark in a rope. The question is, was the court in error in allowing this testimony, period? Absolutely not, because this is not a novel hypothesis. The court found and went to great lengths to discuss Mr. Ciro's methodology. He looks at physical components. We aren't talking about a theory that's untested. We're talking about physical components that Ford knows can fail in this way. Mr. Ciro looks at the physical components, and then he takes a borescope, and he sees evidence of the very thing that has been identified and is part of orthodox engineering since the beginning of mechanical parts. So, again— I think our problem is—and maybe you can help us with this. So, is it possible—is there anybody that testified, was it possible to have this mark and not have the jamming that caused the accident? The inside plastic sheet is—no, it's not. And that's—Mr. Ciro said as much at trial, which I think the jury— I don't know in your exact words. I don't know—I'm sorry. I don't know if he said those exact words, but there should be no gouge marks. Gouge marks are a finding. There are lots of things that should not be in life that are, and so we have—see, what you seem to be saying, though, is that that is self-evident. There are the gouge marks, and that is a basis for him— and I don't know. I'm prepared to say there's enough evidence that there were gouge marks, and that's enough evidence to show that the Ford design was improper, and that the Ford design's improper design caused the accident. But did anybody testify, as I say, about that? Say about what? The effect of the gouge marks in and of themselves, that necessarily that meant there was a failure design. I believe the record reflects that Mr. Ciro testified that the presence of the gouge mark indicates that there was enough pressure to bind the 7.2 pounds of force from the return spring, and that that's evidence of binding. You don't get a gouge mark any other way. Well, any old gouge mark do. I mean, how do you gauge that? Where's the testimony that says that it takes this degree of a gouge mark in order to create a binding situation? I mean, it would just—obviously, I'm not an engineer, but it seems like you could have lots of gouge marks that wouldn't be sufficient to create binding, and perhaps some that would be. And respectfully, I think you're arguing weight. And Mr. Ciro said there should be no gouge marks. And at this point, I think we're talking about the conclusions and not about the methodology. And keep in mind, Dalbert's important because it's about the methodology. And I think the court found that Mr. Ciro's methodology in this instance, based upon the facts, was actually quite reliable because he does identify gouge marks and he identifies the foreign materials and concludes that this was sufficient to cause binding. And then as to the alternative design, the alternative design was specifically designed to keep this from happening. It's a proven element. And so in terms of—I think maybe Ford says he should have tested the alternative design. It's Ford's design, and it is a proven element. If you like, I'm happy to address—although it wasn't addressed earlier, I'm happy to address the jury instructions. I'm happy to address the other evidence, too. But I'm also happy to address the Dalbert analysis. Why didn't Mr. Ciro test whether the binding could resist 7.2 pounds of force in the return spring? Could resist 7.—the fact that the— That's what this is all about, right? There's a 7.2-pound, approximately 7-pound return spring in the throttle spring. That sounds like something you could test. Testing what? That some particulate matter could cause that to hold up? He did, and he found evidence of that with the witness mark. Otherwise— Respectfully, I'm not aware—and Ford doesn't have a test, either, that says you test the spring. But you switched from he did do it to there is no test. I'm sorry. His methodology. I apologize. No, he did not do a test because I don't think we're in the realm of hypothetical— We're in the realm of here's a known—here is a known failure mode, and I've taken a camera and I've identified evidence of this very phenomenon by virtue of the gouge marks. They don't get there but for sticking caused by the debris. And so the court found that methodology acceptable, as other courts have in other jurisdictions. And likewise, Ford has heard no testimony other than arguments and dissatisfaction, or objections—I think he used the court's term—objections about the results of the methodology. And this, respectfully, I think the purpose of Daubert is to determine the methodology. And is the methodology an appropriate methodology for the facts and circumstances of that case? The facts and circumstances of this case, the court went to great lengths to discuss Mr. Ciro's methodology, and there is evidence of the thing sticking. So Mr. Ciro does a—he takes an eyewitness account, which respectfully, I think, is far better than a statistical analysis or some other study, because we're looking at real tangible facts and real tangible evidence, as opposed to postulating some hypothetical or some novel hypothesis. We're not doing that here. We're past that. And so what Mr. Ciro has done is gone past that with his bore scope evaluation. And again, no one has said it's not reliable beyond mere argument. And I don't think arguments or objections, even strenuous objections, are sufficient to overcome the district court's discretion in this case. The district court's analysis is solid. As to the jury instructions, there, again, the jury instructions also appropriately apply the law. And that's of no account. And any evidence of other similar incidents, which wasn't discussed, but I know it's on the record, fell within the court's discretion and did not result in any harm. And I see that I am out of time, according to the light. Thank you very much. Thank you. Thank you, Your Honor. It's just a few points, because I do think the panel understands the issues. First, on the FMEA, again, that shows only a potential problem, that something can happen, something can fail. For example, in FMEA, they say that breaks can fail. And this court, and a panel of Judge Motz was on in the Peters-Martin case, the fact that breaks failed in a given case, breaks can fail. Things can fail. That doesn't establish that the breaks were defectively designed. The FMEA doesn't establish that the speed control assembly was defectively designed. It just says this is a kind of potential problem. To show a defect, what they have to establish is a failure rate of the actual design as used that's unacceptable by some measure. They didn't say one word about that. CIRA had no test to show even what the failure rate was. And that alternative designs had a lower failure rate. And therefore, should have been accepted. And again, CIRA has nothing to say about the failure rate of the alternative designs he proposed. He just says, ultimately, that he thinks there was a failure here. I don't think he showed that. But even accepting that for a moment, it doesn't show that there was a design defect. If, in fact, there was binding in this case, that says nothing about whether or not this was a defective design because binding occurred. That doesn't establish that it should have been designed differently. He had to show the things I referred to, and he didn't. What he did point to, and you heard a lot about, was the boroscope. The problem with that is not so much whether or not the boroscope in itself is valid. Sure, it's valid for seeing things. Nobody's questioning that. The question here, and I think Judge Agee was getting at this, is why is it valid for determining how much particulate will resist, how much dust, we're talking about dust, will resist a 7.2 pound force, which, as the trial record shows, is the weight of a bowling ball. And so if you take a bowling ball and hang it from a speed control assembly, will the dust stop the thing from moving? He never ran any test like that. Ford did. Now, Ford doesn't have that burden, but he didn't even try. And that's the problem is the boroscope doesn't answer the relevant question, which is now I've seen this particulate. Here's my opinion that this particulate is what caused the problem, and it caused it too often, and it caused it more often than alternatives. The boroscope doesn't speak to that whatsoever. What it did also observe are what counsel refers to as gouges, and Mr. Cyril referred to as gouges in a rhetorical way, but when you actually see them, they're just scratches. There's some scratches on there. That doesn't establish at all, even if you describe it as a gouge, if you describe it as a single gouge, that the particulate that he saw is what caused that gouge. That gouge could have been there for 10 years for all anybody knows. He can't connect those two up. And even if you could, it doesn't establish that the gouge created binding. It just shows that there's a gouge, and if anything, if there's a moving scrape along the way, it shows that the thing kept moving, but those are all inferences that an expert would not leave as inferences, but would test, which is what Ford did to determine whether or not the kind of scratches that he identified in the boroscope exam are the kind of thing that could cause binding, or is there some special problem. And what Ford actually did after this accident was to test it against not their burden, but they, acting like scientists and engineers, actually looked at it, ran a series of life cycle tests with thousands and thousands of tests of the device, and determined that a brand new device with absolutely no dust of any kind has scars on it, has scratches on it, because there are, from the molding process and just from the regular kind of friction you get, there are scratches. None of that establishes binding, which is the relevant point. Ford also ran tests to check and see with dust, just everyday dust, where there was no binding, but there was the kind of dust that does get into an engine compartment, and those tests determined that, again, there are scratches that were indistinguishable from the kind of scratches that appeared on Mr. Neese's speed control assembly. Again, no binding. A new one showed scratches, an unused, undusty one showed scratches, and a dusty one showed scratches. Neither of them had any binding. So when it's actually tested, it turns out that a gouge like that doesn't establish anything. Again, that's not Ford's burden. Ford treated this as a hypothesis, that I see a scratch, call it a gouge, that's what caused it. What does a scientist do? What does an engineer do? You test the hypothesis. He never tested it. Again, going back to the dreaded word burden, which we've heard a lot about, they absolutely didn't fulfill their burden as a matter of law, because the only evidence they offered to show that there was a defect in the first place and that the defect caused the problem here was expert opinion evidence that wasn't supported by any relevant testing or other data. For those reasons, we ask that the court reverse the judgment blow. And I thank you for your time. We will come down and greet the lawyers and then take a short recess.
judges: Diana Gribbon Motz, William B. Traxler, Jr., G. Steven Agee